# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**HUSAM ABUOBEID,**

       **Plaintiff,**

                                  **Case No. 2:08-cv-762**

    **v.**                               **JUDGE GREGORY L. FROST**

                                      **Magistrate Judge Mark R. Abel**

**PATROLMAN DANIEL HARGUS, et al.,**

       **Defendants.**

## OPINION AND ORDER

This matter is before the Court for consideration of Defendants' motion for summary judgment (Doc. # 32), Plaintiff's revised memorandum in opposition (Doc. # 43), and Defendants' reply memorandum (Doc. # 45). For the reasons that follow, this Court finds the motion well taken in regard to Plaintiff's federal claims, but declines to exercise jurisdiction over Plaintiff's state law claims and remands said claims to the state court.

## I.  Background

Plaintiff, Husam Abuobeid, asserts a variety of claims in this action arising from numerous events related to his interactions with City of Columbus police officers. The first such event occurred on March 3, 2005, when Plaintiff was involved in a traffic accident. He asserts that Defendant Daniel Hargus, a City of Columbus police officer, became verbally abusive toward him while investigating the accident. Plaintiff was neither cited nor found to be at fault in the accident. According to Plaintiff, however, he soon thereafter began to experience problems with Hargus. Plaintiff asserts that on March 27, 2005, Hargus, who was working special duty in the Short North area of Columbus, Ohio, directed Plaintiff to move Plaintiff's

1

vehicle from a spot near a bar. This led to an alleged argument between Plaintiff and Hargus and Defendant Brian Keefe, another police officer on special duty. Plaintiff asserts that one or both of the officers slammed the door of Plaintiff's vehicle on his arm and leg. Plaintiff also alleges that either Hargus or Keefe called him a "fucking idiot" and told him "Arab, go home." The officers deny slamming the door on Plaintiff and making such comments. Plaintiff filed a complaint with the Internal Affairs Bureau. Defendant Denise Reffitt, a sergeant, investigated the complaint, which Plaintiff ultimately withdrew. Plaintiff also asserts that following withdrawal of the complaint, he approached Hargus on the street and shook the officer's hand and apologized for any misunderstandings, but that Hargus said nothing.

In April 2005, Plaintiff asserts that he received a telephone call from defendant Fares Badran, the operator of a street-side food stand in the bar area that Plaintiff would patronize. According to Plaintiff, Badran told him that Hargus and Keefe had asked Badran to set up a meeting between the officers and Plaintiff to discuss the internal affairs complaint. Badran denies this version of the events and contests the assertion that the officers had asked him to set up such a meeting. Plaintiff reported the purported telephone call to Reffitt. Badran denied making such a call. Plaintiff asserts that he secretly recorded a conversation with Badran in 2007 in which Badran acknowledged that the officers had requested the meeting and explained that if he did not help the officers, Keefe had told Badran that Keefe would no longer assist in another case involving a theft from Badran. Plaintiff asserts that Badran later attempted to recant the purportedly taped statements and that he threatened Plaintiff. Badran denies these events as having never taken place.

In April and May 2005, as well as in November 2006, Plaintiff then received traffic

tickets for such infractions as being parked too far from the curb and for being parked in prohibited areas. Various tickets were officially issued by Defendants Jeff Baker, Scott Plate, and Hargus, all of whom are police officers; Plaintiff asserts, however, that Baker and Plate signed tickets that were actually issued by Hargus. The officers dispute Plaintiff's account of the ticket incidents.

Plaintiff also received a parking ticket in November 2006 for being illegally parked in a bus stop. This ticket, issued by Defendant Howard Pettengill, another officer, was eventually dismissed. Plaintiff asserts that he observed Hargus sitting in Pettengill's cruiser after he received the ticket. Plaintiff also asserts that he approached Pettengill on the street several weeks later and asked why Hargus was harassing him, but that Pettengill, like Hargus earlier, said nothing.

Plaintiff received other tickets during this period of time, but because he does not include these tickets in his claim of a police conspiracy against him, this Court need not identify them here.

Plaintiff's lawsuit also involves a number of difficulties he had in attempting to patronize local bars. He asserts that one night in August or September 2006, he was denied entrance into a local bar named Spice by a doorman named Lou. Plaintiff states that upon leaving, he saw Lou speaking with Hargus. Plaintiff also asserts that when he attempted to enter other nearby bars various unidentified police officers then denied him access to several bars in the area in which Hargus and Keefe worked.

Plaintiff asserts that a notably similar event occurred in July 2007 when he was asked to leave Spice by the same doorman who had previously denied him entry in 2006. Plaintiff states

that he had previously observed the doorman talking to a police officer that may or may not have been Hargus prior to Plaintiff being asked to leave. Upon leaving the bar, Plaintiff called the police department and reported that Hargus had had him thrown out of the bar. When an officer arrived to speak with Plaintiff, Plaintiff asserts, the officer questioned whether Plaintiff was known as the troublemaker who beat up individuals. Plaintiff refused to speak with this officer and maintains that he was soon surrounded in the middle of the street by numerous officers, perhaps eight to twelve officers. Defendant Thomas Quinlan, a lieutenant, then arrived and spoke with Plaintiff. Plaintiff asserts that after he told Quinlan about what had happened and that he had seen Hargus in the past ten to fifteen minutes, Quinlan told him that he was lying because Hargis had been with Quinlan for the forty or so minutes prior. Quinlan then left. Within a week later, Plaintiff filed a second internal affairs complaint against Hargus with Defendant Mark Rapp, a sergeant.

Rapp recommended that the complaint be deemed "unfounded." Defendant Brian Truax, another sergeant, was involved with the chain of command review of the complaint. Truax allegedly believed that the complaint should more appropriately be "cancelled for cause," meaning that the events complained of could not have occurred as Plaintiff asserted. The complaint was cancelled for cause in November 2007. Plaintiff appealed, and Defendant Richard Bash, a commander, informed Plaintiff of the denial of the appeal in December 2007. Plaintiff maintains that all of the officers involved in the complaint process either lied or intentionally neglected conducting a full investigation.

Finally, Plaintiff asserts that in January 2008, while his second complaint was still pending, Hargus parked his cruiser in front of Plaintiff's car and spoke to another officer. After

4

a few moments, Hargus drove away and Plaintiff was only then able to move his vehicle. Plaintiff also claims that later in 2008, he once pulled his car into an alley only to find Hargus in his cruiser parked in the middle of an alley while Hargus spoke to an individual who was standing next to the police car. After several moments, the pedestrian left and Hargus drove away.

Plaintiff filed the original complaint creating this litigation in the Franklin County Court of Common Pleas on July 8, 2008. (Doc. # 3.) Defendants removed the action to this Court on August 8, 2008. (Doc. # 2.) In an amended complaint, Plaintiff asserts claims for civil conspiracy, intentional infliction of emotional distress, engaging in a pattern of corrupt activities, and defamation, as well as claims under 42 U.S.C. § 1983, 42 U.S.C. § 1985(2) and (3), and 42 U.S.C. § 1986. (Doc. # 22 ¶¶ 98-123.)

Since filing this lawsuit, Plaintiff further maintains that he has been stopped by the police twice, followed by the police, and given a ticket. One such incident occurred in October 2008, when police, responding to a citizen's report of gunshots and a man with a gun matching Plaintiff's description, stopped Plaintiff. Another event occurred in January 2009, when Plaintiff was stopped for a license plate violation; Plaintiff contests the factual basis for the stop. Plaintiff also asserts that he was followed by an officer in February 2009, which prompted Plaintiff to call 9-1-1 and then the Federal Bureau of Investigation. Finally, Plaintiff claims that he received a ticket in March 2009. Plaintiff denies the officer's version of the traffic stop, an account in which Plaintiff tells the officer that he is the toughest man in the city, that he was going to have the officer's job, and that he was going to sue the officer just as he had sued other officers.

Defendants have filed a motion for summary judgment on all the claims. (Doc. # 32.)

After a period of delay, the parties have completed briefing on that motion, which is ripe for disposition.

## II.  Discussion

### A.  Standard Involved

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.  *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial.  *Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 234 (6th Cir. 2003).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Muncie*, 328 F.3d at 873 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Consequently, the central issue is " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' "  *Hamad*, 328 F.3d at 234-35 (quoting *Anderson*, 477 U.S. at 251-52).

### B.  Analysis

As noted, Plaintiff asserts federal claims under §§ 1983, 1985, and 1986. Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Thus, in order to assert a valid § 1983 claim, Plaintiff must show that, while acting under color of state law, Defendants deprived him of a right secured by the Federal Constitution or laws of the United States. *See Alkire v. Irving,* 330 F.3d 802, 813 (6th Cir. 2003). Section 1985(2) in turn forbids a conspiracy to deter a party to a federal court proceeding from attending or testifying in court, punishing parties or witnesses who do attend or testify in federal court, and influencing or punishing federal jurors. Section 1985(3) permits a claim against persons who conspire to deprive a person or class of persons of equal protection under the law. To prevail under § 1985(3), Plaintiff must specifically prove:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*See Vakilian v. Shaw*, 335 F.3d 509, 518–19 (6th Cir. 2003) (citing *United Bhd. of C & J v. Scott,* 463 U.S. 825, 828–29 (1983)). *See also Griffen v. Breckenridge,* 403 U.S. 88, 102–03 (1971); *Bass v. Robinson,* 167 F.3d 1041, 1050 (6th Cir.1999); *Collyer v. Darling,* 98 F.3d 211, 233 (6th Cir. 1996). Plaintiff must also demonstrate some racial or invidiously discriminatory animus behind the defendant police officers' actions. *See Vakilian*, 335 F.3d at 519 (citing *Griffen*, 403 U.S. at 102). Finally, § 1986 provides a claim against any person who had

knowledge of a § 1985 conspiracy and who, acting with reasonable diligence, had the power to prevent or aid in preventing the commission of acts under the conspiracy, but neglected or refused to so do. 42 U.S.C. § 1986.

Plaintiff fails to evade summary judgment on all of these claims. The crux of Plaintiff's federal claims is that Defendants have engaged in an ongoing conspiracy manifesting itself in a series of events in which they have violated his constitutional rights. He also asserts a claim against the City of Columbus for failure to train its investigators. But Plaintiff has asserted discrete acts of alleged mistreatment that neither give rise to application of the continuing violations doctrine nor present a conspiracy. As such, most of the events of which Plaintiff complains fall outside the applicable statute of limitations, and the remaining events fail to present actionable claims.

The statute of limitations for Plaintiff's §§ 1983 and 1985 claims is two years. *Dotson v. Lane*, No. 08-4384, 2010 WL 22326, at *2 n.2 (6th Cir. Jan. 5, 2010) ("A two-year statute of limitations applies to section 1985 cases brought in the state of Ohio."); *Cooey v. Strickland*, 479 F.3d 412, 416 (6th Cir. 2007) ("This Court has held that a two-year statute of limitations applies to § 1983 claims in Ohio."). Citing the July 8, 2008 filing date of the original complaint, Defendants therefore assert that all of Plaintiff's claims predicated on events falling before July 8, 2006, are time-barred.

Plaintiff argues that the statute of limitations does not bar claims predicated on the majority of the events of which he complains based on his allegedly belated discovery of the purported violation of his First Amendment rights and due to application of the continuing violations doctrine. Plaintiff posits that prior to 2007, he had no reason to know that his exercise

of his speech rights (*i.e.*, making complaints about Defendants) were motivating Hargus, Keefe, Plate, Baker, and Reffitt. This argument ignores two points. First, the conduct occurring after Plaintiff exercised his rights does not present constitutional violations. Second, Plaintiff's linking of this conduct with his complaints is conclusory; there is no evidence supporting the cause and effect that Plaintiff asserts.

Plaintiff's reliance on the continuing violations doctrine is equally flawed. The Sixth Circuit has explained that the continuing-violations doctrine

> applies only to violations that are part of "a longstanding and demonstrable policy" of illegality. *Sharpe v. Cureton,* 319 F.3d 259, 268 (6th Cir.2003). The policy must extend beyond the plaintiff who asserts the doctrine; to establish a continuing violation, the plaintiff " 'must demonstrate something more than the existence of discriminatory treatment in his case.' " *Id.* (quoting *Haithcock v. Frank,* 958 F.2d 671, 679 (6th Cir.1992)). Rather, " '[t]he preponderance of evidence must establish that some form of intentional discrimination against [a] *class* of which plaintiff was a member was the company's standard operating procedure.' " *Sharpe,* 319 F.3d at 269 (quoting *EEOC v. Penton Indus. Publ'g Co.,* 851 F.2d 835, 838 (6th Cir.1988)) (emphasis added).

*Cherry v. City of Bowling Green, Ky.*, 347 F. App'x 214, 216-17 (6th Cir. 2009). In contrast to what is required to invoke the doctrine, Plaintiff has presented this Court with seemingly unrelated events that do not arise from any apparent policy of discrimination against those of Arabic descent, the class that he asserts as relevant. In an attempt to place these discrete events within a larger interrelated framework, Plaintiff argues that each event is an overt act in furtherance of the alleged ongoing conspiracy against him. This approach is an apparent attempt to meet the Sixth Circuit requirements:

> This court has adopted a three-part inquiry for determining whether a continuing violation exists. First, the defendant's wrongful conduct must continue after the precipitating event that began the pattern . . . . Second, injury to the plaintiff must continue to accrue after that event. Finally, further injury to the plaintiffs must have been avoidable if the defendants had at any time ceased their wrongful conduct. *See*

> *Kuhnle Brothers, Inc. v. County of Geauga,* 103 F.3d 516, 522 (6th Cir. 1997) (holding that the deprivation of a trucking company's liberty interest in intrastate travel was a "continuing violation").

*Tolbert v. State of Ohio Dep't of Transp.*, 172 F.3d 934, 940 (6th Cir. 1999) (discussing doctrine in § 1983 context). Plaintiff's mere allegation of a pattern of continuing conduct is insufficient in light of the court of appeal's reluctance to apply the doctrine liberally, a position to which this Court has adhered. *See Henley v. Tullahoma City School System*, 84 F. App'x 534, 539 (6th Cir. 2003) (stating that " '[t]his Circuit employs the continuing violations doctrine most commonly in Title VII cases, and rarely extends it to § 1983 actions' " and that "[i]n a § 1983 case, discrete acts (as opposed to allegations of a hostile environment) are not actionable if time-barred, even when they are related to acts that are not time-barred" (quoting *Sharpe v. Cureton,* 50 C.C.P.A. 1453, 319 F.2d 259, 267 (2003))); *see also Lee v. City of Columbus, Ohio*, No. 2:07-cv-1230, 2008 WL 5146504, at *2-3 (S.D. Ohio Dec. 5, 2008) (declining to apply doctrine in § 1983 context). Plaintiff must support his assertion that a pattern exists with evidence.

In an attempt to provide this linking evidence, Plaintiff directs this Court to two events. He relies upon the November 14, 2006 incident in which Pettengill–whom Plaintiff calls "Smiley" in Plaintiff's deposition–issued him a traffic ticket. Plaintiff asserts that he saw Hargus sitting in Pettengill's cruiser when Pettengill issued Plaintiff a ticket (later dismissed) for being illegally parked. Based on the proximity of Hargus, Plaintiff concludes that Hargus directed Pettengill to issue the ticket as part of the purported conspiracy. This event fails to present a constitutional violation. Plaintiff testified in his deposition as follows:

> Q      Do you have any reason to believe that Officer Pettengill ever treated you differently on the basis of your national origin or you being Arabic?

> A      No. He's a very nice guy.

(Doc. # 33-2, Abuobeid Depo., at 71.)  Consequently, the November 14, 2006 ticket incident fails to constitute evidence of the national-origin based conspiracy of which Plaintiff complains.

Plaintiff also relies on an alleged incident occurring on July 8, 2007, when he was asked to leave Spice, a local bar, by a doorman named Lou.  The Court will discuss the asserted facts of this alleged incident more fully below in addressing the alleged conspiracy in violation of federal law.  What is important to note here for present purposes is that neither the foregoing ticket incident nor the bar incident present viable claims.  Plaintiff has failed to present unlawful acts occurring within the limitations period.  Thus, Plaintiff's attempted reliance on events falling within the statute of limitations does not salvage those events outside the applicable period.  Even assuming *arguendo* that those events outside the limitations period present instances of misconduct actionable under the federal statutes involved here, a plaintiff nevertheless "cannot use the fact that some of the claims fall within the statute of limitation to redeem those claims that do not."  *Russell v. Ohio, Dep't of Admins. Servs.*, 302 F. App'x 386, 390 (6th Cir. 2008) (discussing continuing violations doctrine).  The statute of limitations bars the majority of the events upon which Plaintiff relies.

What proves problematic for Plaintiff is that he has failed to offer evidence of the overarching conspiracy he asserts exists.  The premise of his § 1983 claim is that an overarching conspiracy links various events spread out over nearly half a decade to create a pattern of continuing violations.  A conspiracy under § 1985, by its very nature, requires that two or more persons or entities conspire.  *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991).  Plaintiff has failed to meet this basic requisite for two reasons.  First, he has not produced evidence in support of a conspiracy but has presented only

conclusory allegations. Second, the intracorporate conspiracy doctrine renders his purported conspiracy impossible.

The intracorporate conspiracy doctrine provides that employees of a corporation or governmental entity cannot conspire among themselves because they are treated as one entity. *Id.* (citing *Dougherty v. American Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984))*. See, e.g., Brunson v. City of Dayton*, 163 F. Supp. 2d 919, 927 (S.D. Ohio 2001) (granting motion to dismiss §1985(3) allegation for failure to state a claim upon which relief may be granted because intra-corporate conspiracy doctrine precluded finding of conspiracy). Thus, as a result of the application of the intracorporate conspiracy doctrine, Plaintiff has failed to set forth facts–as opposed to unsubstantiated and unwarranted legal conclusions–upon which any reasonable juror could conclude that Defendants engaged in a conspiracy so as to present a viable § 1985(2) or § 1985(3) claim. *See Estate of Smithers ex rel. Norris v. City of Flint*, No. 09-1164, 2010 WL 1565467, at *5 n.4 (6th Cir. Apr. 21, 2010) ("In *Hull*, we found that the intracorporate conspiracy doctrine applies to claims brought under sections 1985(2) and (3)." (citing *Hull*, 926 F.2d at 510)).

Plaintiff contests application of the intracorporate conspiracy doctrine. He argues that the alleged conspiracy involved civilians, thereby precluding successful invocation of the doctrine here. But Plaintiff's reliance on the purported involvement of Faris Badran and unidentified doormen fails to salvage the conspiracy claims. In regard to Badran, Plaintiff asserts that Badran told him in April 2005 that Hargus and Keefe wanted to meet with Plaintiff in an attempt to resolve Plaintiff's complaint to the police department. Badran denies ever having made such a statement, and Plaintiff asserts that, in December 2007, he secretly recorded Badran

acknowledging that these officers sought to meet with him.

At first blush, the factual dispute suggests a possible conspiracy, at least between Keefe and Badran. But the purported involvement of Badran occurred in April 2005 when he allegedly tried to set up the meeting at the purported urging of Hargus and Keefe and in May 2005 when he allegedly lied to the internal affairs investigator about whether the officers had spoken with him about setting up a meeting. Plaintiff's assertion that Badran admitted in 2007 that he tried to set up the meeting and that he lied to the investigator is not an overt act in furtherance of a conspiracy; it is at most a refutation of a prior act to impede the investigation related to a possible conspiracy that falls outside the statute of limitations.

Plaintiff's reliance on "civilian doormen" to avoid application of the intracorporate conspiracy doctrine is even more flawed. In his memorandum in opposition, Plaintiff points to "the *civilian* doormen that participated in the denial of entry and the removal from the bars." (Doc. # 43, at 66 (emphasis added).) In his deposition, however, Plaintiff described the doormen as *five police officers* who variously refused him entry into two bars in 2006; he also refers to a doorman named Lou who once either refused him entrance into or asked him to leave the Spice bar. (Doc. # 33-2, Aboubeid Depo., at 79-80.) At best, Plaintiff has offered testimony that the officers were working at establishments near Hargus and that a man identified only as "the sergeant" was directing their actions. Plaintiff assumes it was Hargus but points to no evidence to support this assumption.

In his deposition, Plaintiff testified that he observed Lou the doorman speaking with Hargus after the doorman told Plaintiff he was not welcome at the Spice bar. (Doc. # 33-2, Aboubeid Depo., at 78.) Plaintiff testified that after being told that the doorman did not think

Plaintiff "will make it" (presumably into the bar from a waiting line) :

> I walk away 20 feet and look behind me, and I saw Officer Hargus standing with Lou talking. Surprise me, because Hargus show up out of nowhere. I walk back to Officer Hargus and Lou. Then I look Lou in the eyes and I told him, I know why you kick me out; because of this guy. And I say it loudly.
>
> Neither of them say a single word; not even Lou, not Hargus.

(Doc. # 33-2, Abuobeid Depo., at 78-79.) Plaintiff later testified to the same sequence of events and his identification of Hargus, stating, "If you go back to the first incident, when Lou, the doorman, asked me to leave and he say, yes, you cannot make it, within maybe 30 second to one minute I look behind me. Hargus talking to him." (Doc. # 33-2, Abuobeid Depo., at 84.)

Still later in his deposition, when describing the second incident within the limitations period, Plaintiff testified to the following sequence of July 2007 events: Lou the doorman admitted Plaintiff into the Spice bar. While having a drink, Plaintiff observed Lou speaking with a police officer that may or may not have been Hargus. After about fifteen minutes, a bouncer came up to Plaintiff and told Plaintiff to speak with Lou, who in turn told Plaintiff that he needed to leave the bar. Plaintiff observed two unidentified police officers standing near Lou, neither of whom he knew. Plaintiff then left the bar and, a few minutes later, observed Hargus and Keefe standing a hundred feet away in front of another bar. (Doc. # 33-2, Abuobeid Depo., at 133-37.)

Similarly, in his January 15, 2010 affidavit, Plaintiff states:

> In the moments just before I was asked to leave, I saw an officer talking with the doorman that had just let me in. I did not stare directly in that direction because I did not want to become too obvious. To this day, I still believe it looked like Officer Hargus, though I cannot make a positive identification. Both Officer Hargus and Officer Keefe do look alike from a distance. Both have shaved heads and have similar, though not identical, builds. From the distance I was standing and the profile I was looking at, it may well have been Officer Keefe that was talking to the doorman just before I was removed. I told Officer Quinlan that I believed it was Officer Hargus but that I could not be certain. I still believe this to be true.

14

(Doc. # 43-2, Abuobeid Aff., ¶ 10 (emphasis added).)  Plaintiff's account of the July 2007 incident presents nothing more than the impermissible stacking of inference upon inference, the same sort of flawed stacking that punctures his reliance on Lou the doorman in the 2006 exclusion from the Spice bar.

None of Plaintiff's bar-related contentions establish or permit a reasonable inference of participation in a conspiracy.  No reasonable juror could conclude that doormen or officers refusing Plaintiff entry to bars on streets on which Hargus and Keefe were working special duty creates an inference of conspiratorial conduct; mere proximity is not enough to create a reasonable inference.  It is an equally unreasonable inference to conclude that the specific doorman who asked Plaintiff to leave did so in furtherance of the alleged conspiracy's purported aims.  Concluding that Lou the doorman acted as he did as a result of a conversation with the officer is simple speculation.  And it is yet another inference to conclude that the officer, whom Plaintiff variously can and cannot definitively identify as Hargus, was in any way involved with the defendant officers.  In other words, concluding that any doorman was involved in any conspiracy requires the impermissible stacking of inference upon inference.

Only such unreasonable inferences constitute the purported conspiracy.  This alleged conspiracy is an asserted web of seemingly unrelated events spanning a considerable amount of time and involving acts by disparate officers and private citizens, with the bulk of Plaintiff's allegations so vague and conclusory that they fail to include supporting facts presenting reasonable inferences and connections between events.  In his deposition testimony, Plaintiff repeatedly explains his perception of events being linked by citing to "common sense."  Although he concedes that he received a number of tickets for being parked illegally, he ascribes

numerous other tickets to the overarching conspiracy that only "common sense," as opposed to evidence, tells him exists. Plaintiff also relies on apparently random events such as Plaintiff pulling behind Hargus's cruiser in an alley while Hargus spoke with a pedestrian to imply nefarious machinations, seeking to stack inferences upon inferences in an effort to connect more recent events to time-barred incidents. Plaintiff's attempt to present a conspiracy within the statute of limitations additionally fails due to application of the intracorporate conspiracy doctrine.

This leaves for discussion one aspect of Plaintiff's § 1983 claim, his claim against the City of Columbus for an asserted failure to train its internal affairs investigators. To satisfy his burden on this failure to train claim, Plaintiff must demonstrate the existence of and impropriety of an involved policy, custom, or practice. This is because the Sixth Circuit has explained:

> Municipalities are not . . . liable for every misdeed of their employees and agents. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under §§ 1983." [*Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694 (1978).] This circuit has stated that to satisfy the *Monell* requirements a plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Coogan v. City of Wixom,* 820 F.2d 170, 176 (6th Cir.1987) (adopting the test articulated in *Bennett v. City of Slidell,* 728 F.2d 762, 767 (5th Cir.1984) (en banc), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985)).

*Garner v. Memphis Police Dep't*, 8 F.3d 358, 363-64 (6th Cir. 1993). Thus, what constitutes a *Monell* policy, custom, or practice is of critical import to this case. The United States Supreme Court has held:

> [T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. . . . Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the

rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.

*City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).  The Sixth Circuit has discussed this possibility:

A city may also be liable, in narrow circumstances, for failure to train its officials, if that failure gives rise to a clearly foreseeable violation of constitutional rights reflecting deliberate indifference to them:

"[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury."

*Sell v. City of Columbus*, 47 F. App'x. 685, 691-92, (6th Cir. 2002) (quoting *City of Canton,* 489 U.S. at 390 ) (footnotes omitted).  The ultimate focus "[i]n resolving the issue of a [municpality's] liability, ... must be on adequacy of the training program in relation to the tasks the particular officers must perform."  *City of Canton*, 489 U.S. at 390.  Relying only on conclusory assertions, Plaintiff has failed to identify *any* evidence pointing to *any* underlying policy, custom, or practice that caused any claimed constitutional deprivations.

Defendants are entitled to summary judgment on Plaintiff's § 1983, § 1985(2), and § 1985(3) claims.  The consequent effect of the failure of Plaintiff's § 1985 claims is that his derivative § 1986 claim also necessarily fails.  This is because, as the Sixth Circuit has explained, " '[w]here plaintiff has stated no cause of action under § 1985, no cause of action exists under § 1986.' " *Arauz v. Bell*, 307 F. App'x 923, 930-31 (6th Cir. 2009) (quoting *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 315 (6th Cir. 2005)).  *See also Royal Oak Entertainment, LLC v. City of Royal Oak, Michigan*, 205 F. App'x 389, 399 (6th Cir. 2006)

(affirming summary judgment on § 1986 claim predicated on failed § 1985(3) claim because "[s]ection 1986 liability is derivative of § 1985 liability"); *Swartz v. Eastman & Smith*, 194 F.3d 1314, 1999 WL 801570, at *1 (6th Cir. 1999) (unpublished table decision) ("Furthermore, since Swartz's § 1985 claim is time-barred, an action under § 1986, which imposes liability upon one who fails to prevent a violation of § 1985, cannot be maintained."). Accordingly, Defendants are also entitled to summary judgment on Plaintiff's § 1986 claim.

In light of the failure of Plaintiff's federal claims, this Court presumptively should not address his state law claims. *See Jackson v. Heh*, 215 F.3d 1326, 2000 WL 761807, at *8 (6th Cir. 2000) (unpublished table decision) (referencing 28 U.S.C. § 1367 and stating that "[w]here, as here, a federal court has properly dismissed a plaintiff's federal claims, there is a 'strong presumption' in favor of dismissing any remaining state claims unless the plaintiff can establish an alternate basis for federal jurisdiction." (citing *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1998))). Plaintiff has failed to assert any justification or alternative basis for exercising jurisdiction over his state law claims should the Court grant summary judgment on his federal claims.

The extant question is whether a dismissal without prejudice or a remand of Plaintiffs' remaining state law claims is warranted. The Sixth Circuit has explained that " '[w]hether to remand or dismiss is a matter normally left to the discretion of the district court.' " *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 761 (6th Cir. 2000) (quoting *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1267 (D.C. Cir. 1995)). In considering the alternatives, the Court recognizes that Plaintiff originally sought to pursue his claims in state court. Having weighed this factor, as well as the relevant considerations involving judicial

economy, convenience, fairness to the parties, and comity, this Court in its discretion both declines to exercise its supplemental jurisdiction over Plaintiff's remaining state law claims, *see* 28 U.S.C. § 1367(c)(3) and (4), and remands the state law claims to the state court. *See Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 583 (6th Cir. 2007) ("In cases that have been removed to federal court . . . we have recognized that 'when all federal claims have been dismissed before trial, the best course is to remand the state law claims to the state court from which the case was removed.' " (quoting *Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 359 (6th Cir. 2004))). The Court emphasizes that it expresses no opinion as to the merits of the state law claims.

### III.  Conclusion

For the foregoing reasons, the Court **GRANTS** Defendants' motion for summary judgment on the § 1983, § 1985(2), § 1985(3), and § 1986 claims.  (Doc. # 32.)  Additionally, the Court declines to exercise jurisdiction over Plaintiff's state law claims and remands said claims to the Franklin County Court of Common Pleas.  The Clerk shall enter judgment accordingly and terminate this case upon the docket records of the United States District Court for the Southern District of Ohio, Eastern Division.

**IT IS SO ORDERED**.

         /s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE